IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:06-CV-273-FL(3)

| | |
|---|---|
| LENA JOHNSON,<br>    Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>    Defendant. | **MEMORANDUM &<br>RECOMMENDATION** |

This matter is before the Court upon the parties' joint Motions for Judgment on the Pleadings **[DE's 13-14 & 20-21]**. The time for the parties to file any responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter is before the undersigned for a Memorandum and Recommendation. The underlying action seeks judicial review of the final decision by Defendant denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-13]** be DENIED, Defendant's Motion for Judgment on the Pleadings **[DE-20]** be GRANTED, and the final decision by Defendant be AFFIRMED.

## Statement of the Case

Plaintiff applied for DIB and SSI on January 28, 2004 alleging that she became unable

1

to work on June 4, 2002 (Tr. 13). This application was denied at the initial and reconsideration levels of review. *Id.* A hearing was later held before an Administrative Law Judge ("ALJ"), who found Plaintiff was not disabled during the relevant time period in a decision dated June 20, 2006. *Id.* at 13-21. The Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, rendering the ALJ's determination as Defendant's final decision. *Id.* at 6-8. Plaintiff filed the instant action on January 2, 2007 **[DE-3]**.

## **Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the

court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment (Tr. 15). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) degenerative disc disease and 2) bilateral knee chondromalacia. *Id.* at 15-16   In completing step three,

3

however, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. *Id*. at 16-18.

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work. *Id*. at 18-20. Based on this finding, the ALJ found that Plaintiff could not perform any of her past relevant work. *Id*. Finally, at step five the ALJ concluded that Plaintiff was not precluded from performing other work but rather that there were a significant number of jobs in the national economy that Plaintiff could perform *Id.* at 21. Accordingly, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. *Id.* In making these determinations the ALJ cited substantial evidence, a summary of which now follows.

In November 2002, because of a herniated disc at L5-S1, Plaintiff underwent a: 1) laminectomy; 2) excision of herniated disc; and 3) removal of inferiorly extruded fragment. *Id.* at 118-120. This surgery was performed by Dr. Victor Sonnino, a neurosurgeon. Plaintiff was discharged to home on November 29, 2002 in good condition. *Id.* at 118. On January 2, 2003 Plaintiff reported considerable improvement of her pain. *Id.* at 133. Her strength was 5/5 and equal in the lower extremities. *Id.* Although she had some soreness in her lower back, Plaintiff's pain did not radiate into her legs. *Id.* Dr. Sonnino stated that he expected Plaintiff's pain to continue to subside with time. *Id.*

On March 3, 2003 complained of continued pain in the lower back with occasional

4

pain extending into the buttocks bilaterally. *Id.* at 131. Her strength was again 5/5 and equal. *Id.* She did not walk with an affect. *Id.* at 131. When Plaintiff reported continued leg numbness and back pain, Dr. Sonnino recommended epidural steroid injections. In November, 2003, Plaintiff reported that three epidural injections had not given her any benefit. *Id.* at 129. However, she had negative straight leg raising in terms of any mechanical impairment, intact motor testing, absent reflexes at all levels, and an unremarkable sensory examination. *Id.* Dr. Sonnino reviewed a previous MRI, observing that it:

> shows a fairly good sized disc herniation, central and the right, which is of dubious clinical significance. There appears to be some bulging of the discs extending to the left with some narrowing of the neural foramen and I have to question the significance of that with regards to the ongoing left-sided symptoms.
> *Id.*

On December 4, 2003, Dr. Sonnino noted "[w]ith regards to returning to work, for now and for the foreseeable future, I do not see that that is something that she will be able to do . . . I would be of the general opinion that in all likelihood that she is not going to be able to go back to gainful employment." *Id.* at 128. With regard to this observation, the ALJ noted:

> Dr. Sonnino's treatment notes, however, indicated that the claimant's situation remained perplexing [*Id.* at 128.]. Dr. Sonnino gave no opinions regarding the nature and severity of the impairment and resulting limitations. In addition, the opinion that the claimant was unable to work is an issue reserved for the Commissioner and cannot be accorded controlling weight.
> *Id.* at 19.

Plaintiff reported continued pain on the right side of the back and down into the left leg on December 22, 2003. *Id.* at 127. A myelogram confirmed degenerative changes in the lumbar

5

spine, although there was no evidence of significant stenosis. *Id.* Dr. Sonnino noted that he had not found an ideal explanation for Plaintiff's pain. *Id.* Flexion and extension lumbar x-rays completed in February, 2004 were normal except for some disc space narrowing at L5-S1. There was no evidence of any instability or subluxation, in particular at the L5-S1 level. *Id.* at 125. After reviewing Plaintiff's MRI on July 11, 2005, Dr. Sonnino noted that "[t]his is an unremarkable study except for the postoperative changes . . . [t]here is no evidence of any nerve root compression, and frankly at this point, one would have a hard time making a case for any ongoing compression in the spine." *Id.* at 242. Furthermore, throughout Dr. Sonnino's treatment of Plaintiff, Plaintiff's leg discomfort is described as "numbness" and "cramping of the calf" rather than as "pain". *Id.* at 129, 130, 133. This discomfort at times showed significant improvement. *Id.*

Dr. Paul B. Mitchell also treated Plaintiff. During his initial consultation, Dr. Mitchell noted that Plaintiff's left lower extremity pain had resolved, leaving only "some residual numbness" and intermittent cramping of the left calf. *Id.* at 180 On January 15, 2004 he noted that Plaintiff was not in acute distress and that her motor function was 5/5. *Id.* He also noted that MRI and CT studies showed epidural fibrosis on Plaintiff's left side and no evidence of recurrent disc. *Id.* Plaintiff had right-sided disc protrusion, but no significant nerve root compression or central canal stenosis. *Id.* In March 2004, Dr. Mitchell noted that flexion/extension studies showed degenerative changes with no spondylolisthesis or abnormal movement. *Id.* at 179. A CT completed in April 2004 demonstrated normal lumbar alignment with the exception of minimal grade I retrolisthesis of L5-S1. *Id.* at 154.

Dr. Mitchell recommended a re-do decompression and posterior lumbar interbody fusion, posterolateral arthrodesis with pedicle screw fixation. *Id.* at 178. On May 17, 2004, three months after this surgery was performed, Dr. Mitchell noted that Plaintiff was doing relatively well, and that her left lower extremity pain was gone. *Id.* at 177. On physical examination, Plaintiff was ambulating well with just a cane and her motor strength was 5/5. *Id.* She had a negative straight leg raise. *Id.* An MRI of the lumbar spine completed in August 2004 revealed postoperative changes at L5-S1 with enhancing epidural and perineural scar tissue but no significant deformity or compression of the adjacent thecal sac. *Id.* at 150. There was no evidence of recurrent herniated nucleus pulposus. *Id.* On August 26, 2004, Plaintiff reported to Dr. Mitchell that her pain was improved with only some persistent left leg pain and numbness. *Id.* at 270. On review of Plaintiff's MRI, Dr. Mitchell noted that there was no evidence of recurrent or residual disc protrusion. *Id.* Dr. Mitchell stated that he was not overly concerned with the persistent numbness. *Id.*

Plaintiff was examined by Dr. John Kona on November 11, 2004. *Id.* at 217. She ambulated with normal gait, had excellent balance and was able to get on the examining table with minimal difficulty. *Id.* There was a negative straight leg raise bilaterally, reflexes were symmetric and brisk, all motors were graded a firm 5/5, sensation was intact, and she had normal pulses. *Id.* Both of Plaintiff's knees had full range of motion with intact ligaments and no effusion. *Id.* Radiographs of both knees were unremarkable. *Id.* On January 13, 2005, Dr. Kona diagnosed Plaintiff with bilateral chondromalacia patella, right greater than left, refractory to conservative treatment. *Id.* at 212. Eventually, Dr. Kona performed

7

arthroscopic surgery with lateral release on Plaintiff's left knee in February 2005 and on her right knee in July 2005. *Id.* at 227-270. Post-operative examinations of the left knee revealed that Plaintiff had a good range of motion with some pain. *Id.* at 238-239. An examination of the right knee about three weeks post surgery demonstrated excellent range of motion. *Id.* at 235.

On November 8, 2005, Plaintiff was examined by Dr. Theodore W. Nicholas' pain management center. *Id.* at 248-251. Plaintiff denied any pain in her left leg, describing it rather as constant numbness and tingling. *Id.* at 248. A July 1, 2005 MRI revealed no non-surgical abnormalities. *Id.* Plaintiff was not taking any pain medications at this time. *Id.* at 249. She was independent with activities of daily living and ambulation. *Id.* Supine straight leg raising tests were negative bilaterally, Patrick's test was negative, and Waddell signs were negative. *Id.* at 250. Plaintiff had a good range of motion at both hips. *Id.* No clubbing, cyanosis, edema or atrophy were detected in either lower extremity. *Id.* Manual muscle testing revealed 5/5 strength proximally and distally. *Id.* The sensation was intact in both the lower extremities. *Id.* Plaintiff had a normal-appearing gait. *Id.* Dr. Nicholas performed an electrodiagnostic study of Plaintiff in December, 2005. *Id.* at 244-245. The study was abnormal. *Id.* at 245. There was electrodiagnostic evidence of chronic changes in the S1 innervated muscles, which Dr. Nicholas found consistent with previous nerve impingement at this level. *Id.* There was no evidence of an acute left lumbosacral radiculopathy or active denervation. *Id.* Likewise, there was no evidence of a left lower extremity compression monoeuropathy. *Id.* Finally, there was no evidence of an underlying

peripheral neuropathy, myopathy, or neuromuscular disease. *Id.* Eventually, Dr. Nicholas stated that Plaintiff was doing well and was having fewer spasms and less twitching. *Id.* at 246. On February 27, 2006, Dr. Nicholas opined that Plaintiff did not medically require a hand held assistive device to walk or stand. *Id.* at 233. He further opined that Plaintiff would only require a cane for prolonged ambulation. *Id.* Dr. Nicholas also stated that Plaintiff could sit a total of six hours and stand/walk a total of one hour during an eight-hour workday. *Id.* at 229-230. In addition, Dr. Nicholas stated that Plaintiff could frequently lift and carry up to ten pounds, occasionally lift and carry up to twenty pounds, and occasionally stoop. *Id.* at 232. With regard to Dr. Nicholas' findings, the ALJ made the following observations:

> There is not enough documentation to evidence a prolonged treatment relationship between the claimant and Dr. Nicholas. Dr. Nicholas stated that the claimant was being seen on a regular basis every two months since November 2005, when in fact he saw her only in December 2005 and February 2006. An ongoing treatment relationship had not yet been established. Other than a letter dated November 8, 2005 from a nurse practitioner in his office, an electrodiagnostic report signed by Dr. Nicholas in December 2005, and follow-up visits notes from February 14, 2006, there is no documentation of ongoing treatment by Dr. Nicholas. In addition, the medical source statement includes inconsistencies regarding the claimant's sitting and use of a cane. Controlling weight need not be given to the February 2006 opinions of Dr. Nicholas. The undersigned, however, gave the claimant the benefit of the doubt and limited her to a sedentary residual functional capacity, based on the assessment of Dr. Nicholas.
> *Id.* at 20.

On August 23, 2004, Dr. David Buchin completed an assessment of Plaintiff's RFC. *Id.* at 183-190. He determined that Plaintiff could: 1) occasionally lift and/or carry 50

9

pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk about 6 hours in an 8-hour workday; 4) sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and 5) push and/or pull with no limitations other than those shown for lifting and carrying. *Id.* at 184. Dr. Buchin opined that Plaintiff should be limited to only occasional climbing, stooping and crouching. *Id.* at 185. No manipulative, visual, communicative or environmental limitations were noted. *Id.* at 186-187.

Another RFC assessment was completed by Dr. William Robie on March 7, 2005. *Id.* at 219-226. Dr. Robie determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; and 4) sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. *Id.* at 220. Plaintiff's ability to push and pull was limited in her lower extremities. *Id.* Dr. Robie opined that Plaintiff should be limited to only occasional climbing, stooping, kneeling, crouching and crawling. *Id.* at 221. No manipulative, visual or communicative limitations were noted. *Id.* at 222-223. Finally, Dr. Robie noted that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. *Id.* at 223.

Based on this medical records, the ALJ made the following findings with regard to the severity of Plaintiff's impairments:

> The medical evidence indicates that the claimant has impairments that are "severe" within the meaning of the Regulations, but not "severe" enough to meet or medically equal, singly or in combination to one of the impairments listed, including the musculoskeletal impairments 1.00ff. The claimant's lumbar spine impairment does not meet Listing 1.04A because it is not

10

Case 4:06-cv-00273-FL   Document 22   Filed 09/21/07   Page 10 of 18

> associated with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight leg raising test (sitting and supine). This impairment also fails to meet Listing 1.04B, as it is not associated with spinal arachnoiditis manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours. Finally, this impairment is not associated with lumbar spinal stenosis resulting in pseudoclaudication manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. Thus, Listing 1.04C is also not met. The claimant's knee impairment does not meet Listing 1.02A because it is not characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous anklosis, instability) with chronic pain and stiffness with signs of limitation of motion or other abnormal motion, and findings on appropriate imaging of joint space narrowing, bony destruction, or ankylosis, resulting in inability to ambulate effectively.
>
> *Id.* at 16 (internal footnotes omitted).

Plaintiff testified at the hearing before the ALJ. She stated that she suffers from pain in her lower back which radiates down into her left leg. *Id.* at 291-293. However, she indicated that she was not taking anything for her pain. *Id.* at 293. Plaintiff also experiences numbness in her left leg. *Id.* Because of these impairments, Plaintiff contended that she could not walk very far or stand for very long. *Id.* at 294. Specifically, she asserted that she could not walk more than 200 feet or stand for more than ten minutes at a time. *Id.* In addition, she testified that she could not sit for more than 10-15 minutes at a time. *Id.* at 295. Furthermore, she alleged that she needed to lay down or rest throughout the day because of her back pain. *Id.* at 295-296. She is able to do laundry, vacuum, and sweep, although she completes these tasks at a slower pace than she used to. *Id.* at 296.

With regard to Plaintiff's testimony, the ALJ made the following findings:

11

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.
>
> In March 2003, three months after her laminectomy, she admitted to exercising and walking every other day, and was asked to excercise and walk every day. On examination, her strength was 5/5 and equal, and she did not walk with an affect [*Id.* at 125-139]. In July 2004, three months status post re-do decompression and fusion, the claimant was in no acute distress. Dr. Mitchell noted that she had relatively good range of motion considering her fusion. Motor strength was 5/5, she had a negative straight leg raise, and a negative cross straight leg raise. The plane films show no shifting in hardware or evidence of posterolateral fusion mass. She was referred for physical therapy in July 2004, but was discharged due to poor participation. She quit attending physical therapy [*Id.* at 172-182]. In September 2004, her only medications were occasional pain medications [*Id.* at 207-211].
>
> Regarding her bilateral knee pain, Dr. Lane noted in April 2004 that the x-rays were "completely negative" and that "the knees showed absolutely no effusion whatsoever although she states that they are swollen." Dr. Lane also noted that collaterals were intact, cruciates were intact, and McMurray was negative. In October 2004 she had full range of motion of the knees bilaterally *Id.* Dr. Kona noted in January 2005 that the claimant ambulated with a normal gait and had excellent balance. She had a negative straight leg raise bilaterally and reflexes were symmetric and unremarkable. Motor strength was 5/5 and sensation was grossly intact in all dermatomal distributions. Dr. Kona noted that both knees had a full range of motion, and no effusion [*Id.* at 212-218]. In August 2005, after the arthroscopy on both knees, she reported a pain score of one. Examination demonstrated "excellent range of motion of the knees." In November 2005, the claimant was not on any medications for pain control. She was independent with activities of daily living and ambulation [*Id.* at 227-270]. The overall medical evidence does not substantiate the claimant's allegations of work disabling limitations.
> *Id.* at 18-19.

After weighing this evidence, the ALJ made the following finding with regard to Plaintiff's RFC:

12

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work. She is capable of lifting, carrying, pushing and pulling ten pounds occasionally and less than ten pounds frequently; sitting about six hours in an eight-hour workday; and standing/walking about two hours in an eight-hour workday. Normal breaks are sufficient and she is able to perform work activity on a sustained, regular and continuing basis..
>
> *Id.* at 18

Based on his finding that Plaintiff was capable of performing the full range of sedentary work, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.* at 21. The ALJ relied on the Medical-Vocational Guidelines of the regulations ("Grids") in making this finding. *Id.* Specifically, the ALJ stated "[b]ecause all of the criteria of a Medical-Vocational Rule are met, the existence of occupations in the national economy is recognized by administrative notice." *Id.* Accordingly, the ALJ determined that Plaintiff had not been under a disability through the date of his decision. *Id.*

Based on the forgoing record, the Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Although Plaintiff lists several assignments of error, each assignment essentially contends that the ALJ improperly weighed the evidence before him. However, this Court must uphold Defendant's factual findings if they are supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what

13

Case 4:06-cv-00273-FL   Document 22   Filed 09/21/07   Page 13 of 18

Plaintiff requests this Court to do, her entire claim is meritless. The Court will nonetheless address some of Plaintiff's specific assignments of error.

**A. The ALJ properly evaluated an adequate medical record**

Plaintiff asserts, *inter alia*, that the ALJ failed to adequately develop the medical record in this case. Citing Smith v. Barnhart, 395 F. Supp. 2d 298 (E.D.N.C. 2005), Plaintiff contends the ALJ in the instant matter had a duty to obtain supplemental evidence. However, in Smith, the medical record before the ALJ only "contained some informal diagnoses and prognoses of plaintiff's impairments in her treating physicians' notes, but nothing rising to the level of a specific opinion as to their extent, severity, or plaintiff's residual functional capacity, if any." *Id.* at 302. Here the ALJ had the benefit of extensive records from Dr. Sonnino, Dr. Mitchell, Dr. Kona, and Dr. Nicholas. Each of these physicians treated Plaintiff to one extent or another. The ALJ also had the benefit of two RFC evaluations conducted by DDS consultants. To say that the ALJ relied upon an improperly developed medical record is simply inaccurate.

Likewise, Plaintiff's assertion that the ALJ improperly weighed this ample evidence is also inaccurate. It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245 (Slip Op. at 8)(W.D.Va. 2006)(internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his

14

findings." *Id.* (internal citations omitted).

While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4th Cir.1999) (unpublished opinion)(internal citations omitted).

After reviewing the ALJ's opinion and the underlying record, the undersigned finds that substantial evidence supports each of the ALJ's findings. Furthermore, the ALJ properly considered all relevant evidence–including the evidence favorable to Plaintiff–weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence.

## B. The ALJ did not err by relying upon the Grids

In the instant matter, the ALJ used the Grids to determine that there were jobs in the

national economy which Plaintiff could perform. "[I]f . . . [Plaintiff] has no nonexertional impairments that prevent her from performing the full range of work at a given exertional level, the Commissioner may rely solely on the Grids to satisfy his burden of proof." Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir. 1987); Gory v. Schweiker, 712 F.2d 929, 930-31 (4th Cir. 1983). The Grids are dispositive of whether an individual is disabled when the individual suffers from purely exertional impairments. Aistrop v. Barnhart, 36 Fed. Appx. 145, 146 (4th Cir. 2002)(unpublished opinion).

Here, the ALJ determined that the Plaintiff's was capable of performing the full range of sedentary work. Thus, the ALJ found that no nonexertional impairments existed which prevented Plaintiff from performing the full range of work at a given exertional level.[1] The Court has already determined that this finding was supported by substantial evidence in the medical record. Accordingly, the ALJ was permitted to rely upon the Grids and this assignment of error is meritless.

**C. The ALJ gave appropriate weight to Plaintiff's testimony**

Plaintiff assigns error to the weight given by the ALJ to the Plaintiff's testimony. The ALJ's findings with regard to Plaintiff's subjective complaints have already been summarized. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given

---

[1] "Pain generally is a nonexertional malady, Wilson v. Heckler, 743 F.2d 218,222 (4th Cir. 1984), but if it manifests itself only upon exertion and is consequently taken into account in the assessment of the claimant's strength, the Grids can suffice to shoulder the Commissioner's burden." Aistrop, 36 Fed. Appx at 147 (*citing* Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989)).

16

great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ's findings of fact demonstrate that gave proper weight to all of Plaintiff's limitations and impairments, including pain, in assessing Plaintiff's credibility. Likewise, the ALJ's citations to Plaintiff's medical records, as outlined *supra.*, constitute substantial evidence which support this assessment.

**Conclusion**

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-13]** be DENIED, Defendant's Motion for Judgment on the Pleadings **[DE-20]** be GRANTED, and the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 21st day of September, 2007.

_____
William A. Webb
U.S. Magistrate Judge